**Arnold S. LEVIN, Albert A. Levin, Frank K. Levin, and Jacob Levin,**

v.

**The UNITED STATES.**

No. 49878.

United States Court of Claims.

Jan. 11, 1955.

Arnold S. Levin, Lorain, Ohio, pro se. Jacob Levin, Philadelphia, Pa., was on the brief.

Thomas L. McKevitt, Washington, D. C., with whom was Asst. Atty. Gen., Perry W. Morton, for defendant.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and LARAMORE, Judges.

MADDEN, Judge.

The Government made a contract to sell a war housing project containing 139 dwelling units which the Government had built in Knox, Indiana, to the plaintiffs. It did not convey the property to them until some seven months after the date when, the plaintiffs assert, it should have conveyed it. The plaintiffs sue for the damages which, they allege, resulted

to them from the delay in making the conveyance.

The Government built the project in 1943 at a cost of $426,000. In 1946 it was determined to be surplus and subject to sale under Sections 301 and 304 of the Lanham Act, 42 U.S.C.A. §§ 1541 and 1544. It was appraised at $215,717 and in January 1947, was offered at that price on deferred payment terms to a group of tenant occupants to which group the Lanham Act gave a priority to· purchase. The group offered $100,000 on terms. That offer was refused.

On February 25, 1947, the Commissioner of the Public Housing Authority, hereinafter called PHA, was advised by the Chairman of the Committee on Banking and Currency and the Chairman of the Subcommittee on Government Corporations of the Appropriations Committee of the House of Representatives that the two committees, sitting as a joint committee, had unanimously adopted a resolution that all sales of permanent war housing be for cash. The Commissioner of PHA replied that he would comply with the request, but that present occupants and veterans would not be able to compete successfully on a cash basis. He then, on March 4, 1947, instructed his regional offices that all negotiations thereafter be for sales for cash. The House of Representatives passed a bill requiring such sales to be for cash, but the Senate did not pass the bill.

On March 10, 1947, another committee of veteran-occupants of the Knox project met with representatives of PHA to resume negotiations. They were advised of the policy requiring cash sales. On May 16 PHA advertised for bids on the project, the bids to be submitted by June 25. The advertisement said that bid forms and general conditions covering the sale would be mailed upon request. The bid forms stated that the property might be purchased upon terms. Two bids were received and both were rejected. The plaintiffs' bid for $115,100, on terms, was the higher. The lower bid was for cash.

The bids in response to the advertisement having been rejected, PHA, pursuant to an unpublished regulation, undertook to sell the property by negotiation. Negotiation with the plaintiffs resulted in an agreement to sell the property to the plaintiffs for $150,000 cash. On August 7, 1947, details as to the corporate name in which title would be taken were arranged, and it was agreed that payment would be made and title taken on September 30. A press release, announcing the sale and saying that title would be transferred to the purchaser on September 30, was issued on August 8. and copies were given to the plaintiffs. The Government's formal acceptance of the offer was dated August 20. The contract provided that the purchaser should have a reasonable period of time, not to exceed 30 days from mailing of notice of acceptance, for examination of title; that on or before the expiration of the 30 days, provided no defects of title had been shown, the purchaser should tender the purchase price; and that upon receipt of the purchase price, the Government would deliver the deed. The contract provided that all rentals from tenants accruing up to the date of settlement should accrue for the benefit of the Government, and that all rentals accruing after the date of settlement should accrue for the benefit of the purchaser.

Although the provisions of the formal contract might have resulted in another date for settlement, the parties understood, and the Government's written press release stated, that settlement was to be on September 30. The desirability of that date for the transfer of the right to the rents was obvious. From August 7 to September 30 two of the individual plaintiffs spent most of their time at the project, arranging the multitude of details that would be involved in taking over the property. PHA was also arranging its accounts on the basis of the September 30 closing date.

Soon after the announcement on August 8 of the sale of the project to the plaintiffs, agitation in opposition to the

sale began. There were allegations that the tenants were barred from making an offer of $175,000 for the project, and denials by the PHA that there had been any attempt to make such an offer. Support to the veteran-occupants was given by the Indiana State Department of the American Legion and by the Legion's National Convention. Just before September 28 the Indiana Legion asked the Attorney General of the United States to investigate the sale to determine if it could be set aside, and said that an injunction suit would be filed if the sale was not delayed. On September 28 the senior United States Senator from Indiana, the Governor of the State, and the Congressman from the district where the project was located, sent telegrams to PHA urging that the transfer be deferred.

On September 26 it was agreed that the closing would be at 10:30 a. m. on September 30. The Chicago office of PHA decided on September 29 to have the closing at 2:30 p. m. instead, but did not notify the plaintiffs of the change. The plaintiffs appeared with their money at 10:30 a. m. on the 30th. But during that morning, the Commissioner of PHA, in Washington, acting under instructions from his superior, the Administrator of Housing and Home Finance Agency, advised the PHA's Chicago office that the sale should be postponed for 10 days "in order to give the tenants and others who are protesting an opportunity to present their case." The Chicago office so telegraphed the plaintiffs at the project. The plaintiffs telegraphed their objections and demanded "delivery of the deed today or soonest possible."

On September 30, two separate suits were filed challenging the sale to the plaintiffs. One was in the United States District Court for the Northern District of Indiana, the other in the comparable court for the Northern District of Illinois. The petition in the Indiana proceeding was filed by "a veteran of World War II [suing] individually and on behalf of all other veterans similarly situated," and naming as defendants the United States, the Federal Public Housing Administration, and Knox Homes, the corporate plaintiff herein. The suit asked that the purported sale be declared void and its consummation be enjoined.

The defense of the Indiana suit was referred by the Attorney General of the United States to the United States Attorney for the Northern District of Indiana. Its preparation required clearances between the Department of Justice and the General Counsel of PHA in Washington, the Regional Counsel and Regional Director of PHA in Chicago, and the United States Attorney in Fort Wayne, Indiana. The Government's motion to dismiss was filed on November 26, and its motion for summary judgment on December 2. On November 28 the Government requested a hearing at the earliest date possible. The case was heard on December 12 and 22, 1947, and the petition was dismissed with prejudice on January 12, 1948. The Illinois proceeding was dismissed on the motion of the petitioners therein on February 3, 1948.

The Indiana proceeding having been dismissed by the District Court on January 12, 1948, PHA was advised by Government attorneys that, under a possible interpretation of the rules governing appeals, the appeal period might not expire for 90 days, or until April 12, 1948. The plaintiffs challenged this reading of the rules, contending that the period would expire in 60 days, and that it was unreasonable to await the expiration of the 90-day period.

On April 16, PHA sent to the plaintiffs a copy of the proposed deed, saying that PHA was ready to transfer the title, and listing the amounts to be paid and accounts to be settled. The plaintiffs responded promptly saying they would accept the deed and pay the amounts listed, but would reserve their claims against the Government for the rents which had accrued after September 30, and other damages which accrued on and after that date. PHA responded that it did not recognize any claims such as the plaintiffs had mentioned

On April 28, 1948, settlement was made and the deed delivered. When the individual plaintiffs went back to Knox after April 28, they found that antagonism toward them had increased, and was intense. Tenants refused to pay their rent, necessitating suits for arrearages and some evictions; some occupants who had made agreements to purchase homes in the project refused to carry out their agreements until the sale prices were reduced; businessmen in the town refused to cooperate with the plaintiffs in the sale of units to the occupants. On May 10, 1948, the Committee of the House of Representatives on Expenditures in the Executive Departments, after hearings on April 26, 27, and 28, made a report strongly criticizing the PHA and recommending that that agency declare the sale null and void and re-offer the property to the veterans and occupants. During the seven months' delay, economic conditions had deteriorated somewhat, and the PHA in 1948 offered the nearby Walkerton and Kingsford projects for sale at prices lower than the plaintiffs had been asking for their project in September 1947.

Going back to the time in 1947 when the title should, according to the agreement, have been transferred, Arnold S. Levin, one of the individual plaintiffs, upon being served with process in the Indiana proceeding on October 6, wrote the PHA stating that the suit was a cloud on the title to the property and that the title which the Government could convey, after the suit was filed, would not be marketable. He requested that the Government remove the cloud upon the title as soon as possible by appropriate action to effect a dismissal of the case with prejudice, and that the time for the tender of the purchase price be extended to the time when the action should be dismissed. The PHA promptly agreed to the extension.

The plaintiffs and the Government had a valid contract for the purchase and sale of the real property here involved. The facts recited above show that, at the agreed time for the transfer of title,

there was much confusion in the minds of the public, and of powerful and influential groups and officials, as to whether the sale was lawful. In the circumstances, it was quite natural that the Public Housing Officials involved should want to postpone, temporarily at least, the closing of the sale. To have put the sale through on time in complete disregard of the request of the Senator, the Governor and the Congressman for postponement, would have given the impression that those who opposed the sale were to be confronted with an accomplished fact, so that further discussion or argument would be futile.

We have said that the temporary postponement was the natural thing to do, in the circumstances. We also think that it was not a violation of the plaintiffs' rights. Ordinarily in the sale of real estate, it is not of great importance whether the deed is made on a certain day, or a week or sometimes a month later. The real ownership of the property has passed by the making of the contract, and if the formal passing of the title is delayed, the interests of the parties can be adjusted according to their rights, under the contract and in equity. The plaintiffs say that in this case time was of the essence, because of the suits which were filed on the agreed closing date. Assuming that the filing of the suits before the transfer was made did change the situation materially, that would not mean that the parties had agreed that it was essential that the closing be on that date. It would mean only that an event had occurred on that date which had important consequences. That occurrence, for which the vendor was not responsible, would not make the vendor guilty of a breach of contract, and liable for all the consequences of the occurrence.

We are not convinced that the postponement of the closing, which resulted in the suits being filed before the deed was delivered, had important consequences. The Indiana suit asking that the transaction be declared void would, no doubt have been filed, whether the

deed was delivered or not. The relief sought, a declaration that the transaction was void and the enjoining of its consummation, could have been given after the deed was made as well as before. We have grave doubt that the plaintiffs would have been willing to put their money irrevocably into the Government's hands, in the face of such a suit. The plaintiffs would have expected the Government to defend the suit, and it might well have taken as long to get the suit disposed of as it took in the instant case. Until it had been disposed of, the plaintiffs' title would have been, in fact, unmarketable, and the tenants would have had as much reason to refuse to pay their rents, and the businessmen would have had as much reason to refuse to cooperate with the plaintiffs as they had in the instant case. The plaintiffs' misfortunes were the result of the whole combination of events, and not of the single, uncomplicated fact that they did not get their deed on September 30.

The contract of sale, plus the agreement as to the closing date, gave the plaintiff the right to the benefits of ownership from September 30, 1947. The contract did say that rents should accrue to the vendor until the date of settlement, and to the purchaser thereafter. That certainly did not mean that the acquisition by the purchaser of the benefits of ownership should depend upon the accident of whether some third person would file a lawsuit and thus compel the postponement of the closing for months. The plaintiffs were, from and after the agreed closing date, the equitable owners of the property. As such they were entitled to the rents, less the costs, to the extent that the costs were reasonable, of maintaining the property and collecting the rents.

Our conclusion is that the plaintiffs are not entitled to recover damages for breach of contract because of the non-delivery of the deed on September 30, 1947, but are entitled to recover the rents collected by the Government for the period October 1, 1947, to April 28, 1948, less the costs of maintenance and collection. If the parties can stipulate the amount due, judgment for that amount will be entered. If not, the case will be remanded to a commissioner of this court to take evidence and make a report upon that issue.

It is so ordered.

JONES, C. J., and WHITAKER and LITTLETON, JJ., concur.

LARAMORE, Judge, took no part in the consideration or decision of this case.